IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

DEBRA J. JUELFS,                          )
                                          )
                    Plaintiff,            )          8:06CV402
                                          )
          v.                              )
                                          )
SOCIAL SECURITY ADMINISTRATION,           )     MEMORANDUM AND ORDER
Jo Anne Barnhart, Commissioner,           )
                                          )
                    Defendant.            )
_____          )

          This matter is before the court for resolution of Debra Juelfs's appeal of a final

determination of the Commissioner of the Social Security Administration denying her

application for Social Security Disability and Supplemental Security Income benefits under

Title II and Title XVI of the Social Security Act.  This court has jurisdiction under 42 U.S.C.

§ 405(g).

          I.   BACKGROUND

          Debra Juelfs filed her application for benefits on May 29, 2002, alleging disability

beginning on May 20, 2002, due to depression and seizures.  *See* Filing Nos. 12 & 13,

Social Security Transcript of Proceedings, Vols. I & II ("Tr.") at 132-141.  Her applications

were denied initially and on reconsideration.  *Id.* at 35-47.  On October 15, 2004, following

a hearing, an administrative law judge (ALJ) found that Juelfs was not disabled as defined

in the Social Security Act.  *Id.* at 20-32.  On May 5, 2006, the Appeals Council of the Social

Security Administration denied claimant's request for review.  *Id.* at 8-10.

          Juelfs was forty-seven years old at the time of the alleged onset of her disability.

*Id.* at 75.  She had been employed as a cashier, bartender, order picker, waitress, store

manager, and sewing machine operator. *Id.* at 21. She has a tenth grade education. *Id.* at 646. At the hearing, Juelfs testified that in May 2002 she was fired from her job as a clerk in a dry-cleaning establishment because of her seizures. *Id.* at 649, 660. She estimated she had seven seizures while on the job there. *Id.* at 661. The dry-cleaning job was her last full-time job. *Id.* at 662, 87-89. She stated that she has both grand mal and petit mal seizures and that she typically has more nocturnal seizures than daytime seizures. *Id.* at 651-653. Although she does not generally remember the seizures, she stated that she knows she has them because she wakes up on the floor, has bruises or black eyes and finds things broken in her bedroom. *Id.* at 652, 183-184. Referring to daytime grand mal seizures, she stated that she would generally have one per year, but stated she had two or more nocturnal seizures per month. *Id.* at 652-653. She also testified that she takes her medications faithfully. *Id.* at 656. She is sore and groggy the day after a seizure. *Id.* at 663-664. She further testified that she does not drive and is unable to babysit for her grandchildren. *Id.* at 663.

Juelfs also testified that she has migraine headaches that cause throbbing pain in her temples, vomiting and seeing "flashing lights," about three times per week. *Id.* at 671. She estimated that "about every three months" the pain is so severe that she goes to the hospital for an injection for migraine pain. *Id.* at 663.

She also testified that she suffers from depression. *Id.* at 669. She stated that several days per week she is unable to leave her house because of depression and anxiety. *Id.* at 170, 667. When she goes out alone, she has panic attacks, which include shaking sensations and difficulty breathing. *Id.* at 669. She further testified that she has

2

worsening memory problems. *Id.* at 670. She testified that she continues to receive therapy and medication for depression and anxiety. *Id.* at 656.

Juelfs also testified that she injured her shoulder and she could not lift her right arm after the injury. *Id.* at 660. She had surgery on the shoulder but experiences continuing problems and pain with her shoulder that are not documented in her medical records because she is unable to pay for recommended physical therapy. *Id.* at 655. Medical records show that Juelfs was first treated for seizures in September 2000. *Id.* at 244. In June 2001, she was treated at the Methodist Hospital Emergency Room and by her family physician for a grand mal seizure. *Id.* at 273, 310. She was treated for seizures throughout 2002. *Id.* at 285 (noting "seizure—lots of bruising"), 288, 294, 439. She continued to be diagnosed and treated for seizures from 2003 through 2005. *Id.* at 433, 425, 501-502, 520, 515, 582-583. Beginning in June 2001, she has been prescribed Dilantin for seizures. *Id.* at 310-312, 425, 433. Physician's notes in 2005 indicated that she had been compliant with Dilantin. *Id.* at 502. The records show that at times her seizures were not fully controlled with medication. *Id.* at 305-307, 310, 286, 441, 406, 427. Even when her serum blood levels of seizure medication were within normal range, she continued to have seizure activity. *Id.* at 303, 546, 584, 611. She was referred to a neurologist for increasing seizures despite normal Dilantin blood levels in 2005. *Id.* at 498. At that time, a neurologist assessed her as having "intractable seizures, suboptimally controlled with medication." *Id.* as 583. Medical records show that seizures were observed by Juelfs's mother in 2001 and by customers at the dry-cleaners in 2000. *Id.* at 312, 274. The record also contains the written statement of a friend, Jo Ann Cruse, who witnessed

3

several seizures. *Id.* at 155. She related that during a seizure, Juelfs would slur words, shake, her hands would curl and at times she would lose consciousness and fall. *Id.* at 156. She described Juelfs as "tired and somewhat confused for about three days" following a seizure. *Id.*

Juelfs has also been treated for mental illness. Her treating physician prescribed anti-anxiety and antidepressant medications from 2000 -2002. *Id.* at 291, 296, 301, 317, 324, 325. In early 2002, Juelfs was referred by her treating physician to Lutheran Family Services for more intensive psychiatric treatment for her mental health problems. *Id.* at 296 ("noting MDD [major depressive disorder] - acute)." She attended counseling for several months thereafter. *Id.* at 358-370. In late 2002, medical records indicate that she had profound depression, sleep disruption, suicidal ideation, lack of motivation, low energy and social withdrawal. *Id.* at 358, 375-384. Dr. Eugene Oliveto performed a psychiatric evaluation in January 2003. *Id.* at 356-357. Dr. Oliveto diagnosed Major Depression - Unipolar, Recurrent, Post-Traumatic Stress Disorder, with a rule out diagnosis of Bipolar II. *Id.* Dr. Oliveto rated Juelfs's Global Assessment of Functioning (GAF) at 55.[1] *Id.* at 357. On April 22, 2003, Dr. Oliveto performed a more detailed evaluation utilizing a form that mirrors the criteria set forth in 20 C.F.R. Ch. 111, Pt.. 404, Subpt. P, App. 1, *§* 12.00 C, and assesses specific relevant functional factor under Social Security regulations. *Id.* at 362-368.

---

[1]The Global Assessment of Functioning (GAF) Scale is a rating system for reporting the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association *Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision (DSM-IV-TR) 33 (4th ed. 2000). A score of 55 falls within a range described as: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.

He also noted that Juelfs experienced anhedonia, appetite disturbance, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide. *Id.* at 362, 364).[2] He noted that the claimant's memory and recall are "poor," and that her thinking "is very concrete." *Id.* at 364. He assessed impairments at the "moderate" level in the areas of grooming, schedule maintenance, cooking, and nutrition, but noted that Juelfs "[d]oes not eat well and self-care is poor when she is depressed." *Id.* at 365. He determined that she had "marked" impairments in social functioning in the areas of communicating clearly and effectively, getting along with others, holding a job, avoiding altercations and responding to those in authority. *Id.* at 265. In addition, he noted that Juelfs was "very defensive and non-trusting; also self-conscious because stress can set off seizures." *Id.* Dr. Oliveto also assessed that Juelfs's impairments in maintaining concentration, persistence and pace were "marked" in all areas. *Id.* at 366. He noted with respect to "independent functioning" that Juelfs "[n]eeds a lot of support and cannot tolerate too many demands or too much stress of any kind." *Id.* Dr. Oliveto also found that Juelfs experienced repeated episodes of decompensation of extended duration and that even a minimal increase in mental demands or changes in environment were predicted to cause decompensation. *Id.* at 363, 365-366. Dr. Oliveto stated that the claimant's condition had been severe for two years prior to his report but had worsened in the previous six months. *Id.* at 368. He expected Juelfs's condition to remain at that level of severity for at least six to twelve months. *Id.*

---

[2]These are medical findings listed under "Paragraph A" of the listing for Affective Disorder, 20 C.F.R. Pat. 404, Subpt. P, App. 1, § 12.04(A)(1)(a)-(h).

5

Dr. Oliveto's mental status examination revealed that Juelfs's "immediate recall is poor as is ability to sustain attention" and that her intelligence is below average.  *Id.* at 366. Dr. Oliveto also reported that in stressful circumstances, Juelfs displays numerous worsening symptoms.  *Id.* at 366-367.

Juelfs was also examined by Todd D. Fleischer, Ph.D., a Social Security consulting psychologist, in August 2002.  *Id.* at 337-342.  Dr. Fleischer's mental status examination also revealed "some delayed recall difficulties."  *Id.* at 340.  Dr. Fleischer stated that Juelfs reported a mood that was "depressed and anxious" and observed that "her affect . . . was slightly dysthymic."  *Id.* at 340.  Dr. Fleischer's diagnosis was that Juelfs suffered from "Adjustment disorder with depressed mood—rule out major depression" and "rule out generalized anxiety disorder."  *Id.* at 340-341.  He did not give a GAF rating.  Dr. Fleischer noted that Juelfs reported having panic attacks for a number of years and having at least one major seizure per month.  *Id.* at 339.

Dr. Fleischer concluded Juelfs should be able to understand and act upon short and simple instructions, relate appropriately to co-workers and supervisors, and adapt to "some changes in her environment."  *Id.* at 341.  He stated, however, that Juelfs demonstrated concentration difficulties and described difficulties in maintaining social functioning and recurrent episodes of deterioration when she is stressed.  *Id.* (noting that "she avoids gong outside of her home due to general fear of being away from home").  Dr. Fleischer further stated that Juelfs did not have the ability to maintain concentration and attention needed for task completion.  *Id.* at 342.

Juelfs was also treated for mental illness in 2004 by Dr. Padrna Lassi, a psychiatrist, at Lutheran Family Services.  *Id.* at 474-490.  Dr. Lassi diagnosed "Major Depression

Disorder-Unipolar, Recurrent, PTSD, and rule out Bipolar II." *Id.* at 492. Dr. Lassi treated the claimant with a number of psychiatric medications through January 2006. *Id.* at 490, 630. Juelfs also continued to receive counseling at Lutheran Family Services. *Id.* at 474-490, 630-635. As of July 2005, Dr. Lassi's working diagnosis was Major Depressive Disorder, Anxiety Disorder NOS,[3] Post Traumatic Stress Disorder, and Seizure Disorder. *Id.* at 474.

The medical records also indicate that suicidal ideation may have been a factor connected to Juelfs's admissions to Fremont Area Medical Center Emergency Room on two occasions in early 2004 for lacerations suspected to be self inflicted. *Id.* at 552, 543. Juelfs was also treated at the Fremont Area Medical Center Emergency Room for an anxiety attack and was prescribed anti-anxiety medications by her primary care physician, Misty Janssen, M.D. *Id.* at 500, 502, 505, 527.

Medical records substantiate treatment at Fremont Area Medical Center Emergency Room for headaches, depression and seizures in 2003 and 2004. *Id.* at 434. In May 2003, she was admitted for a headache and for a reported seizure during which she fell and hit her head. *Id.* at 434. An EEG and neurologist evaluation were recommended at that time. *Id.* at 433. Juelfs experienced another fall in September 2004. *Id.* at 512, 564. In April 2005, physicians' notes show that Juelfs had reported seizures occurring once per week, but that Juelfs reported experiencing seizures several times per week beginning in February 2005. *Id.* at 502. Juelfs also reported headaches after falling and hitting her

---

[3]"NOS" is short for "not otherwise specified," and the cited diagnosis refers to a disorder "with prominent anxiety or phobic avoidance" that does not meet the criteria for a more specifically defined category of disorder. DSM-IV-TR at 484.

head while having a seizure in April 2005. *Id.* At that time, Juelfs also complained of decreased concentration and focus. *Id.* at 478.

At the time Juelfs reported increased seizure activity in 2005, a neurologist who examined her noted that, although her "recurrent spells" were better controlled on an increased dose of Dilantin, the "spells" were "unlikely to be seizures." *Id.* at 517. He explained that generalized seizures were unlikely at claimant's age, and that she did not experience tongue biting or incontinence. *Id.* at 517. His impression relied on the fact that, although she reported "spells" up to twice weekly, she never had a major trauma or injured herself with all the falls she had sustained. *Id.* Juelfs was referred to Dr. Singh, an epileptologist, for further evaluation in the epilepsy clinic after that episode. *Id.* at 517. Dr. Singh's examination of Juelfs on September 29, 2005 revealed "intractable seizures which were suboptimally controlled on Dilantin, although she did respond to an increase in Dilantin." *Id.* at 583. Juelfs described her episodes as feeling funny with visual blurring and excessive muscle jerking with urinary incontinence. *Id.* at 582. Dr. Singh prescribed Keppra and advised claimant to refrain from driving for three months. *Id.* at 583. On February 14, 2006, Dr. Singh noted that an EEG showed no clear epileptiform evidence. *Id.* at 575.

Juelfs's mental health records were reviewed by Thomas England, Ph.D., a clinical psychologist, who testified at the hearing. Dr. England was asked to resolve an apparent conflict between Dr. Oliveto's and Dr. Fleischer's opinions regarding the duration and severity of Juelfs's impairments and limitations. At the hearing, Dr. England agreed with Dr. Oliveto's diagnoses and his functional assessment. *Id.* at 362-368. However, Dr. England noted that Dr. Oliveto's analysis referred only to the time period of January to April

8

2003.  *Id.* at 679-680.  Dr. England stated that the record did not show whether Juelfs's condition had persisted for more than twelve months "because of a lack of subsequent records." *Id. at 680.*  Relying on Juelfs's hearing testimony, and assuming that subsequent medical records would substantiate her descriptions, he said "that it sounds like [her impairments] could be possibly at a marked level of impairment in some respects."[4]  *Id.* at 684.

A vocational expert also testified at the hearing.  *Id.* at 689-699.  The vocational expert was asked to assume a hypothetical situation that included "seizure precautions" (i.e., no work around hazards or dangerous equipment, open pits of water, ladders, ropes, scaffolds) plus mental limitations that would exclude all but "routine repetitive unskilled work under ordinary supervision." *Id.* at 691.  Considering those limits, the vocational expert testified that Juelfs could not do any of her past jobs, but that she could be employed at certain unskilled, light or sedentary jobs, including call-out operator, usher, charge account clerk, cashier, counter clerk, bookkeeper, handpackager, or interviewer. *Id.* at 692-696.  The vocational expert was also asked if there were jobs in the national economy for Juelfs if the vocational expert were to consider Juelfs's testimony credible. *Id.* at 696.  In response, she stated that none of the above-listed jobs would be available because the claimant "does not leave her house without accompaniment and because of her depression she stays in her home with bad days three to four days out of a seven-day period." *Id.* at 696.  Similarly, if the vocational expert afforded credibility to the functional

---

[4]Additional records were later submitted to the ALJ and to the Appeals Council.

limitations found by Dr. Oliveto, there would be no jobs in the national economy that Juelfs could perform.  *Id.* at 697.

The ALJ found that Juelfs had the following medically determinable impairments that imposed more than slight limitations on her ability to function:  affective disorder, anxiety-related disorder, personality disorder NOS, seizure disorder, migraine headaches, history of substance abuse in apparent remission, and a history of right shoulder arthroscopy.  *Id.* at 31.  The ALJ found that these impairments, singly or in combination were not equal or equivalent to a presumptively disabling condition.  *Id.*  Although the ALJ determined that Juelfs could not return to her former work because of certain exertional and nonexertional limitations, she found that Juelfs possessed "the residual functional capacity for other work that exists in the regional and national economies in significant numbers."  *Id.* at 32.  She stated that the claimant's testimony "insofar as it attempted to establish total disability" was not credible.  *Id.* at 32.

The ALJ discounted Juelfs's subjective complaints because "objective findings have failed to substantiate the intensity and persistence of her symptoms."  *Id.* at 27.  In discounting the claimant's testimony that she continues to be depressed and her memory is severely impaired, the ALJ relied on personal observations of the claimant at the hearing, noting that "[Juelfs] did not appear to have difficulties recalling past medical, vocational, or personal information when testifying."  *Id.* at 28.  Further, the ALJ discounted Juelfs's testimony that her seizures "continue to progressively worsen," for the reason that "[Juelfs's recent Dilantin levels have been found to be within 'therapeutic' levels."  *Id.*  Also, the ALJ stated that Juelfs had testified that "she experiences grand mal seizures no more than

10

once a year and petit mal seizures no more than approximately 2 times a month."[5]  *Id.*  The ALJ also relied on the fact that "[d]iagnostic evaluations (including brain EEG and MRI studies) have been unremarkable."  *Id.* at 28.  Juelfs's testimony regarding her migraines was discounted because Juelfs testified that "she only requires a visit to an ER for medication no more than approximately once every three months."  *Id.*

## II.  DISCUSSION

### A.  Law

When reviewing a Social Security disability benefits decision, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner.  *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995).  Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole.  *Eback v. Chater*, 94 F.3d 410, 411 (8th Cir. 1996).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind would accept it as adequate to support a decision."  *Cox v. Apfel*, 160 F.3d 1203, 1206-07 (8th Cir. 1998).  In determining whether the evidence in the record is substantial, the court must consider "evidence that detracts from the [Commissioner's] decision as well as evidence that supports it."  *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).

The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits.  *See* 20 C.F.R. § 404.1520(a) (1998); *Cox, 160 F.3d* at 1206.  Under the Commissioner's regulations, the determination involves a step-by-step analysis of the claimant's current work activity, the severity of the

---

[5]As further discussed below, this is a mischaracterization of the testimony.

claimant's impairments, the claimant's residual functional capacity and his or her age, education and work experience.  20 C.F.R. § 404.1520(a); *Flanery v. Chater,* 112 F.3d 346, 349 (8th Cir. 1997).  The Commissioner determines:  (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.  *Cox*, 160 F.3d at 1206.

At step three of the sequential evaluation, if the claimant is found to suffer from an impairment that is listed in the Appendix to 20 C.F.R. Part 404, Subpart P ("the listings") or is equal to such a listed impairment, the claimant will be determined disabled without consideration of age, education, or work experience.  *Flanery,* 112 F.3d at 349.  The listings specify the criteria for impairments that are considered presumptively disabling. 20 C.F.R. §§ 404.1525(a), 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In order to be presumptively disabled by reason of seizures, a claimant must satisfy the requirements of the criteria for epilepsy.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1102 (convulsive epilepsy—grand mal or psychomotor) or § 11.03 (nonconvulsive epilepsy—petit mal, psychomotor or focal).  A presumptively disabling impairment by reason of grand mal seizures must be "documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once

12

a month in spite of at least 3 months of prescribed treatment" with daytime episodes (loss of consciousness and convulsive  seizures) or nocturnal episodes manifesting residuals which interfere significantly with activity during the day.  20 C.F.R. Pt 404, Subpt. P, App. 1 § 1102(A)& (B).  To be considered presumptively disabled by reason of petit mal seizures of the listings, a claimant must have seizures that are documented by an EEG and by detailed description of a typical seizure pattern with all associated phenomena.  *Id.,* § 11.03 (1996).  These seizures must occur more frequently than once a week in spite of at least three months of prescribed treatment.  *Id.*  The seizures must be accompanied by an alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.  *Id.*

The degree of a claimant's impairment is determined with reference to the "type, frequency, duration, and sequelae of seizures."  *Id.,* § 11.00(A).  At least one detailed description of a typical  seizure, including "the presence or absence of aura, tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena," is required. *Id.* (noting also that a reporting physician should indicate whether description of seizures reflect his or her own observation and the source of ancillary information).  "Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available."  *Id.*

 Also, with respect to "prescribed-treatment," the convulsive-disorder listings require that the criteria can be applied only if the impairment persists in spite of adherence to prescribed antiepileptic therapy.  *20 C.F.R. §* 11.00(A); Soc. Sec. Rul. 87-6, 1987 WL 109184, *1-*3.  Such adherence can normally be determined with reference to objective evidence of serum blood levels of phenytoin sodium or other antiepileptic drugs.  *Id.* (noting

13

"[b]lood drug levels should be evaluated in conjunction with all the other evidence to determine the extent of compliance").

The listings were revised in 2002 to eliminate the previous requirement that a seizure was documented by an electroencephalogram ("EEG").  *See* Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018-01, 20019, 2002 WL 661740  (April 24, 2002) (noting that "[w]ith the exception of nonconvulsive epilepsy in children, [the Social Security Administration] will no longer require that an EEG be part of the documentation needed to support the presence of epilepsy") (to be codified at 20 C.F.R. §§ 11.00(A), 11.02, 11.03).  The Social Security Administration found that it is rare for an EEG to confirm either convulsive or nonconvulsive epilepsy in adults.  *See* 67 Fed. Reg. at 20019.

To be presumptively disabled by reason of a mental impairment, a claimant must meet the criteria set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00-12.10.  The Social Security Administration has developed a special technique to ensure proper evaluation of the severity of mental impairments.  *Id.* §§ 12.00 (I); 404.1520a (describing Psychiatric Review Technique Form or "PRTF").  A PRTF is a standard document that generally must be completed when a claimant alleges a mental impairment.  *See Pratt v. Sullivan,* 956 F.2d 830 (8th Cir.1992) (*per curiam*).  The PRTF mirrors the criteria found in the listings for mental impairments in the Social Security regulations.  *Id.*

The mental impairment listing for an affective disorder such as depression consists of a statement describing the disorder, a set of medical findings ("Paragraph A criteria") that substantiate medically the presence of the particular mental disorder, a set of impairment-related functional limitations ("Paragraph B criteria") that detail the impairment's

14

effect on functions deemed essential to work, and certain additional functional limitations ("Paragraph C criteria").  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00(A), 12.04; *see generally Pratt,* 956 F.2d at 834-35 & nn.7&9;  404.1520a(b)&(c).  The finding that a medically-determinable mental impairment exists under Paragraph A must be established by medical evidence consisting of signs, symptoms, and laboratory findings that are gleaned from a mental status exam or psychiatric history.  *Id.,* §§ 404.1520a(b)(1); 404.1508.

If a mental impairment is found, the ALJ must rate the degree of functional limitation resulting from the impairment based on the extent to which the impairment interferes with the claimant's ability to function independently, appropriately, and on a sustained basis in four areas of function which are deemed essential to work.[6]  *Id.,* § 404.1520a(c)(3).  These areas of activity correspond to the Paragraph B criteria and are assessed before the Paragraph C criteria; the Paragraph C criteria will be assessed only if the Paragraph B

---

[6]Those areas are:  activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3).  The degree of functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform those work-related functions.  *Id.,* §§ 404.1520a(c)(4), 404.1520a(d)(1).

For the first three areas (activities of daily living, social functioning, and concentration, persistence, or pace), the rating of limitation is based upon the following five-point scale: none, mild, moderate, marked, and extreme.  For the fourth area (deterioration or decompensation), the following four-point scale is used: none, one or two, three, four or more.  *Id.,* § 404.1520a(c)(4).  The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.  *Id.*  In other words, those degrees of limitation will satisfy the listings.  Conversely, ratings of "none" or "mild" in the first three areas and "none" in the fourth area will generally indicate that the claimant's impairment is not severe unless the evidence indicates that there is more than a minimal limitation in the claimant's ability to do basic work functions.  *Id.,* § 404.1520a(d)(1); *see also*  § 404.1521(b)(1)-(6) (setting forth examples of basic work activities).

Claimants with ratings of "moderate" or "marked" in the first three areas, and "one or two" or "three" in the fourth area have neither presumptively non-severe impairments nor presumptively disabling impairments.  To determine disability in these "in-between" cases, the ratings of the degree of functional limitation will be compared to the criteria of the appropriate listed mental disorder.  *Id.,* § 404.1520a(d)(2); *see, e.g.,* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (requiring two of either "marked" restrictions in first three areas or repeated episodes in fourth area).

criteria are not satisfied.   20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A).  Paragraph C of the affective disorders listing requires demonstration of "a medically documented history of a chronic affective disorder of at least two years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication and psychsocial support," as well as one of the following: (1) repeated and extended episodes of decompensation; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C)(1)-(3).

   After rating the degree of functional loss, the ALJ is to determine the severity of the mental impairments with reference to the ratings.  *Id.*, § 404.1520a(d).  If the mental impairment is severe, then the ALJ must determine whether it meets or equals a listed mental disorder.  *Id.* § 404.1520a(d)(2).  This is done by comparing the presence of medical conclusions and the rating of functional loss against the Paragraphs A and Paragraph B criteria or Paragraph A and Paragraph C criteria of the appropriate listed mental disorders.  *Id.; see also id.,* § 12.00(A).  With respect to depression, the required level of severity is met when "the requirements in both A and B are satisfied, or when the requirements in C are satisfied."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

   If a claimant has a severe mental impairment that neither meets nor is equivalent in severity to any mental impairment listing, the Commissioner will then assess residual functional capacity.  20 C.F.R. § 404.1520a(d)(3).  In determining residual functional

capacity, the ALJ must consider the effects of the combination of both physical and mental impairments.  *Baldwin v. Barnhart,* 349 F.3d 549, 556 (8th Cir. 2003).  The Social Security Act requires the Commissioner to consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling. *Cunningham v. Apfel,* 222 F.3d 496, 501 (8th Cir. 2000); 20 C.F.R. § 404.1523.

It is inherent in psychotic illnesses that periods of remission will occur and that such remission does not mean that the disability has ceased.  *Andler v. Chater,* 100 F.3d 1389, 1393 (8th Cir. 1996).  "Indeed, 'one characteristic of mental illness is the presence of occasional symptom-free periods.'" *Id.* (*quoting Poulin v. Bowen,* 817 F.2d 865, 875 (D.C. Cir. 1987)).  Although the mere existence of symptom-free periods may negate a finding of disability when a physical ailment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of a disability claim.  *Id.*  Unlike many physical impairments, it is extremely difficult to predict the course of mental illness. *Id.*  Symptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse.  *Id.*  Individuals suffering from mental disorders often have their lives structured to minimize stress and help control their symptoms; they may be more impaired than their symptoms indicate.  *Hutsell v. Massanari,* 259 F.3d 707, 711 (8th Cir. 2001); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E).

Similarly, efforts to obtain gainful employment will not preclude a finding that a claimant is unable to engage in substantial gainful activity.  *See Andler,* 100 F.3d at 1392. The "unsuccessful work attempt" concept was designed as an equitable means of disregarding relatively brief work attempts that do not demonstrate sustained substantial

17

gainful employment.  *Id.*; Soc. Sec. Ruling 84-25, 1984 WL 49799 (1984).  A work effort that lasts less than three months can be considered an unsuccessful work attempt when a claimant is unable to perform work for more than a short time, and must quit due to an impairment, or due to the removal of special conditions related to the impairment that are essential to the further performance of the work.  *Andler,* 100 F.3d at 1392-93.  Work efforts that last between three and six months require an additional showing that either there were frequent absences due to the impairment; the work was unsatisfactory due to the impairment; the work was done during a period of remission; or the work was done under special conditions.  *Id.*; Social Security Ruling 84-25(2)(a)-(d), 1984 WL 49799 at *2.

When assessing the credibility of a claimant's subjective allegations, the ALJ must consider the claimant's prior work history; daily activities; duration, frequency and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions.  *Tate v. Apfel,* 167 F.3d 1191, 1197 (8th Cir. 1999) (applying analysis mandated by *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir.1984), to seizure complaints).  "'An ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole.'"  *Jackson v. Apfel,* 162 F.3d 533, 538 (8th Cir. 1998) (quoting *Porch v. Chater,* 115 F.3d 567, 572 (8th Cir. 1997)).  Also, a treating physician's opinion does not automatically control, but will be given controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  *Reed v. Barnhart,* 399 F.3d 917, 920 (8th Cir. 2005).

In determining residual functional capacity, a hypothetical question posed to a vocational expert must precisely set out all the claimant's impairments that are supported

by the evidence.  *Pickney v. Chater,* 96 F.3d 294, 297 (8th Cir. 1996).  Furthermore, a hypothetical question posed to a vocational expert must capture the concrete consequences of claimant's deficiencies.  *Id.*  Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision.  *Id.* at 296.

### B.   Analysis

In denying Juelfs's claim, the ALJ discredited her subjective complaints of grand mal and petit mal seizures, severe migraine headaches, panic attacks, and depression. Although the ALJ quoted the *Polaski* standards for evaluation of subjective complaints, it does not appear that she applied them.[7]  The record does not support the ALJ's conclusion regarding the frequency and severity of Juelfs's seizures and other complaints.  In making her credibility determination, the ALJ mentioned Juelfs's daily activities as conflicting with her physical and mental complaints.  She relied on the facts that Juelfs does not have restrictions on her driver's license (although evidence establishes that Juelfs does not drive), is able to dress and wash herself, performs routine household tasks, and occasionally socializes with immediate family.  These activities are not inconsistent with having nocturnal seizures twice a week and suffering from severe migraine headaches. A claimant may have a disabling seizure disorder and still be able to perform some daily home activities.  *See Flanery,* 112 F.3d at 350 (8th Cir.1997) (finding that while seizures "may not be totally disruptive in a home environment, [they] . . . could hardly be

---

[7]The ALJ's opinion contains no discussion of the type, dosage, effectiveness, and side effects of Juelfs's medications, nor any discussion of the location, duration, frequency and intensity of Juelfs's pain, seizures, depressive episodes or anxiety attacks.

accommodated in the workplace."); *see also Burress v. Apfel,* 141 F.3d 875, 881 (8th Cir. 1998) ("the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work.").

The objective medical evidence supports Juelfs's testimony regarding the frequency and severity of her seizures. The record shows that Juelfs has consistently reported, over the course of a four or five year period, grand mal seizures that occur up to two to four times per month, and that persist after extended periods of treatment with medication. Medical evidence also shows that Juelfs has experienced seizures when her blood levels were both at or above therapeutic levels and below therapeutic levels. In addition, medical records show that Juelfs's blood serum levels of phenytoin were often below therapeutic levels in spite of compliance with treatment. There is nothing in the record to indicate that Juelfs failed or refused to take her antiepileptic medication.

Also, the ALJ placed inordinate emphasis on unremarkable MRI and EEG results and on isolated instances in 2000 and 2002 when Juelfs was found to have suffered "spells" because of low-blood sugar. This earlier incident predated the diagnosis of a seizure disorder and, in any event, an episode of low blood sugar is not inconsistent with a seizure disorder. The evidence does not establish that Juelfs's seizures were ever completely controlled by medication. The ALJ also relied on a misinterpretation or misstatement of the claimant's testimony with regard to the frequency of the seizures. Taken in context, Juelfs's statement that a seizure occurred only once a year referred to a daytime grand mal seizure and not to nocturnal seizures.

In addition, the ALJ improperly discounted medical diagnoses as having been based only on Juelfs's own recitation of events. A patient's report of complaints, or history, is an

20

essential diagnostic tool. *See, e.g., Flanery,* 112 F.3d at 350 (noting that any medical diagnosis must necessarily rely upon the patient's history and subjective complaints). There is nothing in this record to suggest that Juelfs's medical practitioners doubted, or should have doubted, that Juelfs experienced seizures. Her claimed symptoms are consistent with the nature of her disorder and with eyewitness testimony. Indeed, her treating physicians relied on her recitation of events to prescribe antiepileptic medication. Moreover, Juelfs's account of her daily activities is not inconsistent with a disabling seizure disorder. She testified that, although she can care for her own needs, her sleep is often disrupted by seizures and her daily activities are limited by the residual effects of the seizures the following day.

Further, the record supports the ALJ's finding that Juelfs had a medically-determinable mental impairment, however, the ALJ did not properly assess its severity under the procedures set out in the regulations. Instead, she conflated the criteria that would establish a presumptively disabling mental impairment into the analysis of Juelfs's residual functional capacity. The ALJ's determination, based on Dr. England's testimony, does not support the conclusion that Juelfs "is capable of performing routine, repetitive unskilled work under ordinary supervision and able to sustain brief and superficial social interaction" was based in part on the ALJ's finding that Juelfs's mental health treatment after 2003 consisted only of medication checks and counseling for issues of self-esteem. The record shows that Juelfs continued to be treated by a psychiatrist and continued to be diagnosed with both Major Depression Disorder—Recurrent and Anxiety Disorder. The Commissioner's medical expert concurred with her treating psychiatrist's diagnoses and testified that Juelfs would have marked limitations on her ability to function in the workplace

if her depressive condition had persisted for more than twelve months.  However, both the medical expert and the ALJ failed to consider Dr. Oliveto's finding that Juelfs's condition had reached the level of severity he described over two years before he issued his report in April 2003 and that he expected her condition to remain at that level of severity for at least six to twelve months.  The evidence in the record does not controvert Dr. Oliveto's assessment on the PRTF that Juelfs's limitations were incompatible with the ability to perform work-related functions in three of the four areas that are deemed essential to work.

If the ALJ and the Appeals Council had properly credited the opinions of treating physicians and Juelfs's testimony, the evidence would have supported a finding that she was presumptively disabled (i.e., "met the Listings") by reason of either a convulsive condition or mental illness.  At the least, the evidence of seizures, migraine headaches, and shoulder pain, combined with her history of depression and anxiety, supports the finding that Juelfs was unable to return to her former jobs as a bartender, waitress, or dry-cleaning store clerk.

Under the familiar sequential analysis, the burden is on the Commissioner to prove that there are jobs in the economy that Juelfs can perform.  The Commissioner did not meet that burden.  The record evidence does not support a conclusion that she retained the residual functional capacity to perform work that exists in the national economy.  The ALJ's failure to include Juelfs's frequent intractable seizures and her mental impairments in the hypothetical questions posed to the vocational expert rendered those questions defective.  Juelfs's seizure disorder and significant mental impairment is supported by the record and she was entitled to have the vocational expert consider those impairments.  The vocational expert was not asked whether seizures of the frequency and severity supported

in the record would limit Juelfs's ability to work.  The supposed "seizure restrictions" that the ALJ proposed in her hypothetical to the vocational expert were not supported by anything in the record.  Also, the physical and mental impairments supported by the record should have been considered in combination by the vocational expert and the ALJ.

If the record presented to the ALJ contains substantial evidence supporting a finding of disability, a reviewing court may reverse and remand the case to the district court for entry of an order granting benefits to the claimant.  *Parsons v. Heckler,* 739 F.2d 1334, 1341 (8th Cir. 1984).  In this case, Juelfs has been consistently diagnosed with severe impairments since 2002.  This action has been pending at various stages since May 2002.  The claimant is over fifty years old.  This is considered "closely approaching advanced age" under the regulations.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.00(g).  Her previous work is considered unskilled or semi-skilled and would involve few, if any, transferable skills.  *See, e.g., Cunningham,* 222 F.3d at 503 (8th Cir. 2000); United States Dep't of Labor, Employment and Training Admin., Dictionary of Occupational Titles, Vol. II Appendix C at 1009 (4th ed. 1993) (referring to specific vocational preparation).  In addition, her educational development is limited.  Under the circumstances, further hearings would merely delay benefits; accordingly, an order granting benefits is appropriate.[8]   *Id.* Accordingly,

IT IS HEREBY ORDERED:

1.    The decision of the Commissioner is reversed;

---

[8]Under the medical-vocational guidelines, when an individual closely approaching advanced age can perform a full range of light or sedentary work, but must perform unskilled or semi-skilled labor and has no transferrable skills from her previous work, as is the case here, she is considered to be disabled. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.00 (Table No. 1) (sedentary work); *id.* § 202.00 (Table No. 2) (light work).

2.     This action is remanded to the Commissioner with instructions to award

benefits.

DATED this 21st day of March, 2007.

BY THE COURT:

_____

s/ Joseph F. Bataillon
Chief Judge